## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EAGLE E&R LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION: 1:20-00417-KD-C** |
| | ) | |
| **SPECIALITY DIVING OF LOUISIANA,** | ) | |
| **INC.,** *et al.*, | ) | |
| **Defendants.** | ) | |

### ORDER

This matter is before the Court on the Defendants' motion for partial summary judgment on its Fourteenth and Fifteenth Defenses (Docs. 114, 115), the Plaintiff's Response (Docs. 122, 123), and the Defendants' Reply (Doc. 127).

## I.   **Findings of Fact**[1]

This litigation is the result of disputes stemming from June 2019 maritime contracts executed by Plaintiff Eagle E&R, LLC (Eagle), Defendant Specialty Diving of Louisiana, Inc. (Specialty Diving) and Defendant Specialty Offshore, Inc. (Specialty Offshore) (collectively Specialty), through which Specialty chartered dredging-related vessels from Eagle. These contracts include a charter party contract for Specialty to charter the EDWARD G dredge. (Doc. 44; Doc. 122 at 28 (Dep. Wallace at 6)).[2]

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000). Additionally, the Court has limited the facts set forth in this Order to only those relevant to the issues/claims for which summary judgment relief is sought.

[2] Deborah Wallace is the owner and president of Specialty Diving of Louisiana, Inc. and Specialty Offshore, Inc. (Doc. 122 at 28 (Dep. Wallace at 7-8); Doc. 114-18 at 3 (Resp. Interrog)).

Specifically, Eagle is the owner of the EDWARD G dredge.  (Doc. 122 at 28 (Dep. Wallace at 6); Doc. 122 at 2 (Decltn. Simmons)).[3]  Eagle purchased the dredge in 2017 for $268,000 from non-party Gulf Sand and Gravel, Inc. (Gulf Sand).  (Doc. 122 at 6 (Dep. Sanchez at 17)).  After purchasing the dredge, Eagle rebuilt the dredge pump (new housing, new parts, bearings, etc.) and the parts were purchased through the Metso distributor. (Doc. 124-18 at 3 (3/20/20 Sanchez email to Whitmer; Doc. 122 at 8-10 (Dep. Sanchez at 93, 100-101)).[4] A dispute arose between Eagle and non-party Gulf Sand regarding the condition of the dredge (and the repairs and modification Eagle had to make).  This dispute resulted in state court litigation in the Circuit Court of Baldwin County, Alabama for breach of contract, unjust enrichment, and fraud/misrepresentation claims.  (Doc. 114-2).

On August 15, 2018, a marine survey for appraisal valuation of the dredge was conducted by Childs Dunbar of New Orleans Marine Services LLC.  (Doc. 124-8 at 2-12).  According to the survey findings, the dredge was in acceptable and satisfactory operating condition -- suitable for its intended service -- with a valuation of $1,750,000 as its estimated market value and $2,500,000 as its estimated replacement value. (Id.)

On June 27, 2019, Eagle and Specialty executed a Charter Party contract -- a demise or bareboat charter -- for Specialty to charter the EDWARD G from Eagle for $59,000/month with the rate continuing until the dredge is redelivered to Eagle "in like good order and condition as

---

3 Charles Simmons is the Vice President of Operations for Eagle.  (Doc. 122 at 2 (Decltn. Simmons)).

4 On occasion, for ease of reference and to provide a more complete picture of the parties' factual allegations, the Court has cited to Specialty's exhibits in opposition to Eagle's motion for summary judgment (Doc. 124 *et seq*) as well as Eagle's exhibits submitted in support of its motion (Doc. 110-1 *et seq*), as each party's briefing cross-references the other's summary judgment motions, arguments, and exhibits in support.

when received[]" -- unless lost.  (Doc. 114-3 (the contract); Doc. 114-7 at 7 (Dep. Maturin at 7); Doc. 122 at 31 (Dep. Wallace at 49-51); Doc. 1 at ¶9).  During the term of the charter, Specialty had exclusive possession of, and control over, the EDWARD G; selected and paid the crew; provided all the food, fuels, stores, and other necessaries; and obtained insurance for the dredge. (Doc. 122 at 31 (Dep. Wallace at 51-52)).

Relevant terms of the contract include the following:

... An On-charter survey was conducted and the following deficiencies will have to be corrected as per Schedule A (attached) prior to (1) above applying [delivery provision]...
***
... Charterer ... agrees that upon expiration or termination of this Charter for any reason whatsoever that ... equipment  and apparel will be immediately returned to the  Owner ... unless the Dredge is lost, in like good order and conditions as when received, ordinary wear and tear resulting from proper use excepted and Charterer shall be liable for any and all injury and damages to the Dredge, her equipment and apparel whatsoever and howsoever caused during the term of this Charter, it being understood that this is a demise Charter of the Dredge. Charter Hire is to continue in the event the Dredge is returned in a damaged condition for the reasonable repair period required to repair said damage ...

... Neither the Charterer nor Charterer's representative shall have any right or authority to create, incur or permit to be imposed upon the Dredge any lien whatsoever and Charterer agrees to carry a true copy of this Charter on board the Dredge, which on demand shall be exhibited to any person having business with the Dredge for any supplies, fuel, repairs or anything of any nature that would give rise to a lien on the Dredge. Charterer agrees to advise all persons furnishing supplies, repairs, fuel or necessaries to the Dredge that neither the Charterer nor the Charterer's representative has any authority to authorize, incur or permit any lien of any kind or character to be levied against said dredge and that it is prohibited under the terms of this Charter from so doing ...
***
... No alteration to the Dredge should be made without prior written consent of the Owner. All repairs and maintenance to the Dredge are to be provided by the Charterer at its expense ...
***
... The parties agree that should any dispute arise between them, same shall be litigated in the courts of the State of Alabama, which courts shall have exclusive jurisdiction. The parties further agree that should any dispute arising between them or any action or matter arising out of or concerning this Charter, same shall be governed solely by the laws of the State of Alabama, both parties submitting to exclusive jurisdiction of the Courts of the State of Alabama ...

(Doc. 114-3 at 2-5 at ¶¶2, 9-10, 13, 18).

Per the attached Schedule A (Pre-Inspection Deficiency List of Dredge Equipment), Eagle agreed to correct certain deficiencies identified by Specialty as follows:

- Change all fluids including bearings
- Provide all cables as needed
- Fix Turbo on Generator
- Hydraulic lines, which look like they could go anytime
- Pins for ladder are very worn
- Compartments that are in bad shape
- Fuel needs to be changed or cleaned
- All new oils and filters
- Safety Cables for Hand Rails need to be put on
- Change all batteries-
- Repack Stuffing Boxes on Dred pump and Tug boat

The above following items have to be done either by the Lessee (Owner) or the Lessor. If the Lessor addresses these items, the amount of cost of labor and supplies will be deducted from the First Lease Payment.

These items must be corrected prior to Charterer taking delivery.

EQUIPMENT MUST BE DELIVERED TO LESSEE IN GOOD OPERATING CONDITION TO PERFORM THE TASK IT WAS DESIGNED FOR. IF EQUIPMENT WILL NOT PERFORM WITHIN 15% OF THE ORIGINAL SPECIFICATIONS THEN THE LESSOR WILL BE RESPONSIBLE FOR ALL REPAIRS TO BRING THE EQUIPMENT BACK TO THE EXPECTED PERFORMANCE IN THE FIRST 30 DAYS OF OPERATION. DURING THIS TIME OF REPAIRS, THERE WILL BE NO RENT DUE. RENT WILL COMMENCE UPON ALL REPAIRS COMPLETED AND SIGNED OFF BY BOTH LESSEE AND LESSOR.

8.3
AFTER THIRTY (30) DAYS OF CONTINUOUS OPERATION LESSOR MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE EQUIPMENT OR ANY OTHER REPRESENTATION OR WARRANTY WITH RESPECT TO THE EQUIPMENT. LESSOR REPRESENTS AND WARRANTS THAT IT HAS THE RIGHT TO LEASE THE EQUIPMENT AS PROVIDED IN THIS LEASE

(Doc. 114-3 at 7 (Schedule A)).  Additionally, per Schedule A's Section 8.3, once the EDWARD G operates for 30 consecutive days, it becomes Specialty's responsibility to make any needed repairs. (Id.; Doc. 122 at 30 (Dep. Wallace at 46-47)).

On July 24, 2019, Specialty (Roland Maturin (Maturin)) issued a notice to Eagle detailing costs incurred due to non-performance of the dredge.  (Doc. 114-8.)  On July 26, 2019, Specialty (Marshall Whitmer (Whitmer)) emailed Eagle (Michael Sanchez (Sanchez), Richard Perry (Perry), Deborah Wallace (Wallace) and Maturin), complaining about the condition of the dredge and to make Eagle aware of the amount of money Specialty was spending trying to keep it running, stating that the companies needed to coordinate and work it out as Eagle owed Specialty $65,810.37:

"[b]ecause of the lack of being maintained and preparation for rental on Eagle's part, and because of on-going problems related to lack of Eagle's preparation and maintenance."  (Doc. 122 at 63 (Dep. Whitmer at 63-64); Doc. 122 at 74-75, 79-81 (7/26/19 series of emails)).

On July 29, 2019, Specialty emailed Eagle that the dredge was "still not right" and it has "to monitor" it to keep it from sinking.  (Doc. 122 at 78; Doc. 122 at 87 (Dep. Maturin at 67)).  On July 30, 2019, Sanchez emailed Specialty (Whitmer, Wallace, Maturin, Simmons, Perry) stating "I understand the frustration of things not going to plan and appreciate the willingness to work towards solution[,]"proposing counter-invoices for the repairs.  (Doc. 124-13 at 4).

At that time, Specialty was aware of problems with the dredge but did not terminate the contract with Eagle.  (Doc. 122 at 87 (Dep. Maturin at 65-66); (Doc. 122 at 65 (Dep. Whitmer at 70).  Per Specialty, it did not terminate the contract even though it could have under its terms because: "[w]e were hoping that we could keep working with Eagle. We ... had contracts. We had a dredge. If they would work with us, we would keep repairing the dredge and get their dredge up in really good operational condition which would be a bonus for them. Also, they would be getting funds to put it toward their bank note and we would be making money with it so that we could move forward and stay in the dredging business." (Doc. 122 at 64 (Dep. Whitmer at 65)). At some point, Maturin also notified Eagle that the dredge had a hole in its hull that had apparently been fixed with a life jacket and a two-by-four.  (Doc. 114-7 at 12 (Dep. Maturin at 152)).

Per Maturin, the dredge had problems from June 29, 2019 - February 14, 2020.  (Doc. 122 at 87, 89-91 (Dep. Maturin at 65, 126-131, 137, 139); Doc. 124-25 at 3 (Dep. Maturin at 53)). These problems were identified as follows by Maturin:

> **June 29, 2019- July 28, 2019** Dredge ... arrive at coast guard dock  Galveston,TX routine  inspection  reveals  all fluids  are  contaminated  with water all have to  be

changed. .... clutch on dredge not engaging, no speed control on dredge, cracks on suction pipe, leak on stern tank with life vest wedged 2 X 4 to slow leak. ... brought to Mike Sanchez attention after he visited jobsite on or about July 22.

**July 31, 2019 August 31, 2019** equipment moved to Houston clutch on dredge still not fixed, cutterdrive leaking badly, dredge taking on water on both sides. Eagle notified, of problems another visit by Sanchez. Divers attempted to put splash zone on leak area. Verbally indicated to Eagle the dredge would have to be drydock to address the leaks. Houston cement finished by August 15, 2019. Could not find a dry dock to repair the dredge. Had to wait till Sept 1 closest place with slot was Galveston.

**Feb 14, 2020** Suction pipe fails due to wear, Sanchez indicates the pipe had been replaced before Specialty began use of dredge. At time of failure Specialty had dredged less that 200,000 yards of material (not enough material to wear pipe to less than quarter thickness} Eagle notified of a estimate to repair Once repairs began it was found that more pipe had to be replaced which drove the cost up.

**Feb 24, 2020** The pump shaft main bearings failed, the assembly was brought to local machine shop. The machine shop indicated the bearing where manufactured in the 70's. After further investigation it was found that the pump assembly was manufactured during the same period. Only two dredges had that pump assembly, the other is owned by coastal dredging of slidel,la. According to Coastal the pumps were manufactured for a phosphorus mine in Florida, the threads are of a special ... type. No machine shops could manufacture the threads or even balance the impeller.

Eagle had informed Specialty the pump had been completely refurbished before lease. However the impeller had excessive wear and NO new impeller had been available so the worn out impeller must have been left in the pump. Between the worn out impeller and the 70's bearings, this is what caused the failure. Upon contacting Eagle it was found that the spare parts list provided to Specialty could not be used without extensive modifications. In addition Eagle did not have the bearing indicated on the parts list provided (see June 4th spare list) See email from Charles to bring parts to Pearce for repair.

(Doc. 124-25 at 4).

In or around September 2019, Maturin sent Sanchez a letter disputing a $49,500 invoice that Eagle billed for the month of September 2019, detailing various issues with the condition of dredge that had been noted in mid-July 2019 (void tank, clutch on main engine, dredge taking on water, etc.), stating that he had been in "constant dialogue" with Simmons (Eagle) "throughout all

of this[,]" referencing the quote for $11,500 in necessary repairs, noting that the cutter drive motor needs to be rebuilt or replaced, and asserting that "the condition of the equipment leased from Eagle has been seriously misrepresented from the beginning and Specialty has continued to attempt to work with you throughout this entire process. We will be amiable to move forward but we will not take the liability and costs it is requiring to get it operational."  (Doc. 114-12).

On October 2, 2019, Whitmer sent a letter to Sanchez again referencing the issues and costs the dredge had cost them "which is of no fault of Specialty[,]" because the agreement was "that you would furnish equipment that will work as needed, and unfortunately, it has not since the inception." (Doc. 114-13 at 1).  Specialty then explained its modifications to the dredge to get it operable and increase its value, adding that the modifications were discussed with Eagle's representative Charles Simmons (Simmons) and so they were not done without Eagle's knowledge or approval, and requested an adjustment to Eagle's invoice.  (Id.)

As of October 8, 2019, Specialty received an email from Eagle that stated that all items -- regarding the dredge -- that needed to be addressed or repairs were completed, and that any maintenance and repairs going forward belong to Specialty as confirmed by Eagle (per Sanchez); to which Specialty responded it was good news and "we will abide by the contract." (Doc. 122 at 34 (Dep. Wallace at 77-79)).  Specialty continued to use the dredge subject to the respective agreements at that time and did not relinquish control or possession of the dredge to Eagle.  (Id. (Dep. Wallace at 79)).

On October 21, 2019, Sanchez emailed Wallace about the unauthorized design change to the dredge (including a prior mid-October 2019 email) referencing billing disputes, hull repairs to

the dredge, and other items -- expressing disbelief that Specialty performed unauthorized design modifications to the dredge without Eagle's authorization.  (Doc. 124-14 at 1-4).

In response to a November 5, 2019 letter from Eagle, Specialty stated that Simmons knew about the dredge modifications and made no objections, and that Specialty will not pay rental for the time the repairs were being made because Eagle "knew of the need for repairs and possibility that the vessel could sink if not performed yet did nothing to address[] [p]rior to leasing the vessel to Specialty, Eagle was aware of the problems with the hull but failed to repair or inform Specialty of the problems. Had Eagle been honestly forth coming with this, Specialty would have required the repairs be made before Chartering[.]" (Doc. 124-17 at 1). Per Specialty, it "has been transparent during this whole agreement, had the dredge been in the proper working order as represented by Eagle, we would not be having this conversation. I want to be perfectly clear. Specialty is willing to work through these issues, however if Eagle wants to take an adverse position Specialty will take the same position and proceed accordingly."  (Id.)

On November 19, 2019, Specialty sent an email to Sanchez regarding "Issues with Dredge Corrected by Specialty" listing 13 issues identified with the dredge (and with the CRISTI and equipment) that Specialty had to correct.  (Doc. 122 at 96-99); Doc. 122 at 34-35 (Dep. Wallace at 80-81)).  Even with these issues however, Specialty did not terminate the contract and continued to use the vessel when operational.  (Doc. 122 at 35 (Dep. Wallace at 81)).  Additionally, Specialty was interested in purchasing the vessel "to just end the relationship with Eagle and...continue....[to] stop pouring money into it[.]"  (Id. (Dep. Wallace at 81-82)).

In February 2020, the dredge pipes failed and problems with the dredge pump occurred (failure on the shaft bearing and impeller was missing pieces).  (Doc. 122 at 90-91 (Dep. Maturin

at 129-130, 137)).  Specialty conducted repairs and had the dredge fully repaired and operated the dredge in dredging operations thereafter without pump problems, continuing to use the dredge until the Summer of 2020.  (Id. (Dep. Maturin at 130-131, 137)).  Despite these problems, Specialty never attempted to terminate the charter.  (Id. at 91 (Dep. Maturin at 137)).

On March 16, 2020, Maturin emailed Whitmer regarding the dredge repairs, stating that it "has been down for repairs due to bearing failure[]" and that "it was found that the bearing[s] were manufactures [sic] in the 1970s.....the pump was manufactured within the same time period. NONE of the parts to repair the pump ...will fit that pump[]" even though Eagle presented the year the dredge was manufactured as 2008.  (Doc. 124-8 at 13; Doc. 114-7 at 11 (Dep. Maturin at 149). Maturin then referenced a 2018 marine survey by Childs Dunbar on the dredge (Id.; Doc. 124-8 at 2-12), indicating it was built in 2008, adding that it is "clearly misleading as Specialty had no reason to believe that the pump is over 40 yrs old....any and all costs will have to be charge[d] to Eagle...." (Doc. 124-8 at 13).  On March 17, 2020, Whitmer emailed Sanchez stating that Specialty would not make any payments until verification of the age of the dredge was resolved and the correct dredge pump was obtained, and that "the problems...are your responsibility."  (Doc. 124-18 at 4).

From March 20-25, 2020, Sanchez and Whitmer communicated via email about repairing the dredge.  (Doc. 114-14).  Specialty noted that it was trying to get the dredge running but explaining that the dredge "was represented as a Different year than the parts are. This is not our problem that you all were not aware of this...Trying to fix what was not what was represented...and has never operated continually...We have lost Millions of Dollars of revenue because of these problems....these parts are for equipment years older than what was represented....." (Id. at 1). On

9

March 20, 2020, Whitmer emailed Sanchez stating that Specialty wanted to resolve the problems but the dredge needs to be put on other work or returned to Eagle, adding "I believe that you [Eagle] all got taken [by Gulf Sand] but that is up to you all to resolve. The dredge is not what was rep[res]ented to us and so that creates a challenge..." (Id. at 3).

Sanchez responded via email to Whitmer, explaining as follows: after Eagle purchased the dredge from Gulf Sand in September 2017, it rebuilt it (new housing, new parts, bearings, etc.) and the parts were purchased through the Metso distributor; the August 2018 survey is accurate the dredge pump was totally rebuilt with new impeller, new pump housing and parts and new bearings and drive components in 2018; there is no documented agreement to provide Specialty spare parts and Specialty has still not paid Eagle for the spare parts supplied; the dredge had been in Specialty's possession since July 2019 without a bearing failure; and maintenance is Specialty's responsibility and the dredge "has long passed the 30 day continuous operation window (October 2019) AND operating at high pump rates[]" -- adding that Specialty "ha[s] no documented maintenance program for the dredge...that you are leasing..." (Doc. 124-18 at 3-4). Eagle further noted that Specialty had failed to make any payment arrangements on the unpaid invoice of $49,500 and stated that if the money was not wired/received, it terminated the charter contract per Section 15, and would take necessary legal action to repossess the dredge. (Id. at 4).

On March 26, 2020, in response to the payment request from Eagle, Whitmer emailed Eagle stating the dredge has been down for some time and is costing Specialty $38-46,000/day and "will not consider paying anything till this problem is rectified....[by] eagle ...fixing these problems. But as stated before it is an Eagle problem." (Doc. 124-15). On April 6, 2020, Whitmer emailed Eagle again stating it would not be paying anything for Eagle's equipment "which has

10

been miss [sic] represented to us and you have not done anything to resolve the problems." (Doc. 114-20 at 1). "We have been out of pocket over $350,000.00 fixing your Dredge which was miss [sic] represented to us....the age of the dredge...was not what you represented to us....we will not pay for something that is not what it was represented..." (Id.) Sanchez responded via email stating that Whitmer was misinformed and was making erroneous claims. (Id.) On May 25, 2020, Whitmer issued a letter to Sanchez identifying $322,880.38 in expenses that Specialty had unexpectedly incurred due to deficiencies in the dredge and for the "Dredge not being what it was represented[]" (Doc. 124-21 at 2).

On June 3, 2020, Specialty received a termination of Charter Party and cease and desist letter from Eagle, terminating the Charter Party contract, at which point Specialty canceled the contract and "the relationship with Eagle deteriorated beyond communications." (Doc. 122 at 33, 37-38 (Dep. Wallace at 67, 109, 114); Doc. 122 at 101-104). The letter detailed the issues Eagle raised with Specialty. (Doc. 122 at 101-104). Per Specialty, Eagle was within its rights to terminate the contract in the manner that they did. (Doc. 122 at 37 (Dep. Wallace at 110)).

On June 16, 2020, Specialty filed a notice of a claim of lien on the EDWARD G dredge with the National Vessel Documentation Center of the U.S. Coast Guard in the amount of **$295,636.10** for unpaid vessel repairs, which Eagle alleges placed a cloud on the title of the dredge and has impaired its use and marketability. (Doc. 44 at 3-4 at ¶12-14; Doc. 122 at 38 (Dep. Wallace at 114-115); Doc. 110-1 at 80-82 (the Notice of Lien)). Per Specialty, the lien was filed to document and protect its interests as it spent hundreds of thousands of dollars from January 1, 2020 through April 15, 2020 constantly fixing the equipment on the EDWARD G during the charter contract -- for protection. (Doc. 122 at 38-39 (Dep. Wallace at 114, 117-118)).

On July 9, 2020 Specialty returned the dredge to Eagle. (Doc. 122 at 3 (Decltn. Simmons)). Per Eagle, the dredge was in a substantially damaged condition and had been improperly modified without written consent. (Doc. 44 at 5).

On August 21, 2020, Eagle initiated this litigation, and as amended on March 8, 2021, alleges various claims against Specialty including a Third Cause of Action for breach of contract/charter party for the EDWARD G against Specialty. (Docs. 1, 44 at 12-13 (amended complaint)). Concerning Eagle's breach of contract claim against Specialty, Eagle alleges that the EDWARD G charter contract is valid and binding; Specialty breached contract by failing to return the dredge in the same condition as it was received, by improperly modifying dredge's ladder, by failing to pay the Charter Hire as mandated by the contract, and by asserting a lien on the dredge; and that as a result, Eagle was damaged and has incurred substantial costs and expenses to repair the damage to the dredge and remediate improper modifications, because it has not received charter hire payments due, and by its inability to lease or sell the dredge due the need for repairs and the presence of the lien asserted by Specialty. (Doc. 44 at 12).

In response, Specialty denied the allegations and asserted a counterclaim for indemnity, alleging that on December 10, 2019, Eagle caused a different vessel, the dredge tender CRISTI, to sink and caused the death of its crew member. (Doc. 49). Additionally, in defense of Eagle's breach of contract claim (Third Cause of Action), Specialty asserted these affirmative defenses:

## FOURTEENTH DEFENSE

Defendants assert that the Charter Parties are also void *ab initio* because they were procured through fraud and intentional misrepresentations.

## FIFTEENTH DEFENSE

Defendants assert that their agreement to the Charter Parties was predicated upon material misrepresentations and false inducements by Plaintiff, making the Charter Parties defective and contrived through fraud.

(Id. at 14).

Specialty now moves for summary judgment on these defenses arguing that there are no genuine issues of material fact with respect to fact that Eagle intentionally misrepresented the condition of the EDWARD G which induced them to enter into the Charter Party.  As relief, Specialty asserts that the Charter Party should be declared void *ab initio*.

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).   Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

To succeed, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.     Conclusions of Law[5]

Specialty moves for summary judgment, as to only the EDWARD G, on its affirmative defenses (Fourteenth and Fifteenth Defenses) asserted in response to Eagle's Third Cause of Action for Breach of Contract/Charter Party. Specifically, Specialty argues that Eagle's fraudulent misrepresentations relating to the condition of the dredge, made to induce Specialty to execute the Charter Party contract, results in the contract being void *ab initio.*

 As summarized in Allen v. Uncle John Holdings, LLC, 2020 WL 4275821, *3 (S.D. Ala. Jul. 24, 2020):

> ... the Court of Appeals for the Eleventh Circuit has explained that "our interpretation of maritime contracts sounds in federal common law, so we look to the general common law of contracts." Internaves de Mex. s.a. de C.V. v. Andromeda S.S. Corp., 898 F.3d 1087, 1093 (11th Cir. 2018). "The elements of a breach of contract claim are the existence of a contract, material breach, and damages." Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under Contract No. B0621MASRSWV15BND, 766 Fed. Appx. 795, 803 (11th Cir. 2019).
>
> The same elements are necessary under Alabama law. GRUPO HGM Tecnologias Submarinas, S.A. v. Energy Subsea, LLC, 2019 WL 7879661, at *7 (S.D. Ala. Oct. 31, 2019), report and recommendation withdrawn upon appearance of counsel for defaulting defendants, 2020 WL 609757 (S.D. Ala. Jan. 21, 2020) (.... "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.") ...

In defense of Eagle's breach of contract claim, Specialty asserts the affirmative defense of fraudulent misrepresentation via inducement (fraudulent inducement). In Alabama:

---

5 The parties do not dispute the applicability of Alabama law.  Moreover, the charter party contract contains a choice of law provision stating as follows: "... should any dispute arise between them [Eagle and Specialty] or any action or matter arising out of or concerning this Charter, same shall be governed solely by the laws of the State of Alabama, both parties submitting to exclusive jurisdiction of the Courts of the State of Alabama." (Doc. 114-3 at 5 at ¶18).

... [t]he elements of fraud include "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.' *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (emphasis omitted). Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000). So, to present a claim for fraudulent inducement, the party must prove "damage occurring as a result of the reliance." *S. Energy Homes, Inc. v. AmSouth Bank of Ala.*, 709 So. 2d 1180, 1186 (Ala. 1998).

Koster v. Grafova, 2019 WL 2124532, *13 (N.D. Ala. May 15, 2019). See also e.g., Alabama Psychiatric Services, P.C. v. 412 South Court Street, LLC, 81 So.3d 1239, 1247 (Ala. 2011) (fraudulent misrepresentation); Moore v. Prudential Res. Serv. Ltd. P'p, 849 So.2d 914, 923 (Ala. 2002) (fraudulent misrepresentation); Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000) (fraudulent inducement).  See also Baker v. Travelers Ins. Co., 207 F.Supp.3d 1246, 1251-1252 (M.D. Ala. 2016). "A 'material fact' is 'a fact of such a nature as to induce action on the part of the complaining party[]' ... the misrepresentation need not be the sole inducement. It is sufficient if it materially contributes and is of such a character that the [complaining] party would not have consummated the contract had he known the falsity of the statement."  Baker, 207 F.Supp.2d at 1251 (internal citations omitted).  See also Farmers Ins. Exchange v. Morris, 228 So.3d 971, 977-978 (Ala. 2016) (citing Kidder v. AmSouth Bank, N.A., 639 So.2d 1361, 1362 (Ala.1994) (that a party had a duty to speak the truth; that party made a false representation of material fact intentionally, recklessly, or innocently; that another party acted upon the false representation; and that said party suffered loss, harm, or damage proximately resulting from the false representation).  "[T]he burden is on the party alleging fraud to prove by substantial evidence the element of reliance." Hunt Petroleum Corp. v. State, 901 So.2d 1, 4 (Ala. 2004) (citing Allstate

Ins. Co. v. Eskridge, 823 So.2d 1254, 1264 (Ala. 2001)). The Alabama Supreme Court has held that fraudulent inducement claims are governed by the "reasonable reliance" standard. Farmers, 228 So.3d at 978 (citing Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Ala., 991 So.2d 701, 706 (Ala. 2008) and Foremost Insurance Co. v. Parham, 693 So.2d 409, 421 (Ala.1997)). See also Hardy v. Jim Walter Homes, Inc., 2008 WL 906455, *12 (S.D. Ala. Apr. 1, 2008) (listing cases holding that Alabama law requires that a party bringing a claim for fraudulent inducement prove reasonable reliance); Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So. 2d 777, 783 (Ala. 2000) (the reasonable reliance standard governs). To determine whether a defendant's reliance on a plaintiff's statement was reasonable, courts "must focus on what an ordinarily prudent person would have done under the circumstances of the transaction." Eley v. Travelers Ins. Cos., Inc., 2011 WL 671681, *12 (M.D. Ala. Feb. 18, 2011) ("[t]he mere fact that a plaintiff is told one thing is not enough to make reliance upon it reasonable; rather, a plaintiff has a duty to read associated written documents and to investigate facts that should provoke inquiry[]"). "A corollary to the reasonable reliance requirement is that '[w]here a party has reason to doubt the truth of the representations or is informed of the truth before he acts, he has no right to act thereon.' Billy Barnes, 2007 WL 2812768, at *6 (citation omitted); see also Tyler v. Equitable Life Assur. Soc. of U.S., 512 So.2d 55, 57 (Ala.1987) ('if a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation')." Hardy, 2008 WL 906455 at *12.

Specialty presents its fraudulent inducement defense as follows: "Eagle fraudulently induced them to enter into the Charter Party for the EDWARD G by misrepresenting the condition of the dredge ... despite materially representing to the contrary[]" and that "[d]espite knowing the

poor condition of the ...[dredge] ... and the major issue regarding the age of the pump as compared to the manufacture date of the dredge, this information was never shared with the Specialty Entities. To the contrary, Eagle ... represented to the Specialty Entities that the equipment would be delivered in 'good operating condition.'[] Moreover, Eagle told the Specialty Entities that the dredge 'included spare parts and inventory.'"  (Doc. 115 at 1, 4). Per Specialty:

> ... as a primary inducement for the Specialty Entities to enter into the Agreements, Eagle agreed to provide a vessel and dredge in a seaworthy condition, fit for duty in all respects, able to perform to certain specifications, and of the quality and kind described to the Specialty Entities; that did not happen. It is also undisputed that the dredge was not in "good operating condition" at the time of delivery and that Eagle failed to remedy ten of the eleven items on the repair list contained in Schedule A of the Charter Party before the EDWARD G was delivered to the Specialty Entities. Additionally, Eagle represented that it had a litany of "critical spares" (i.e., spare parts) for the dredge, the CRISTI, and the equipment, which was also untrue. As a consequence of these falsehoods, the Specialty Entities incurred significant expense in purchasing equipment - in some cases having to custom manufacture equipment - and repairing the vessels and equipment to keep the vessels operating ...

(Doc. 115 at 5).  As support, Specialty relies on: 1) Eagle's "judicial admissions" (allegations in a First Amended Counterclaim filed in a separate state court lawsuit in the Circuit Court of Baldwin County, Alabama (Gulf Sand & Gravel, Inc. v. Eagle E&R, LLC, 05-CV-2019-901413) about the dredge's condition; and 2) the testimony of Charles Simmons (Simmons).

## A.    Judicial Admissions

Specialty argues that Eagle's May 14, 2020 first amended counterclaim in the state court case is a judicial admission establishing fraudulent inducement: "Eagle pled in another lawsuit that the EDWARD G was sold to it in a poor condition and with component parts over thirty years older than the purported age of the dredge. The lawsuit confirms that Eagle discovered these deficiencies *before* they chartered the EDWARD G to the Specialty Entities."  (Doc. 115 at 2

(emphasis in original)).  Specialty adds that Eagle alleged that Gulf Sand made false representations regarding the condition of the dredge (including that the pump was manufactured in 1975 and not 2008 and that the dredge was non-functional, in poor condition, and that the dredge was not fit for its particular use and purpose).  (Doc. 114-2).

As alleged by Eagle in its state court counterclaim, after it purchased the EDWARD G from Gulf Sand, it had "to make certain repairs, and modifications to the Equipment in order to bring it up to 'satisfactory, good functioning condition' and make it 'fit for its particular use and purpose,'" and Gulf Sand failed to pay for those necessary repairs and modifications.  (Doc. 114-2).  Eagle explains that its counterclaim allegations make clear that *before* Specialty took possession of the EDWARD G, Eagle had *already* brought the dredge back to "satisfactory, good functioning condition" and "fit for its particular use and purpose." (Doc. 123 at 14).  Per Eagle, the dredge was thus provided to Specialty in an already repaired condition such that the dredge was operational in June 2019. As such, per Eagle, any additional operational problems or repairs that subsequently arose -- *after Specialty took possession of the dredge* -- are *new* and the existence of Eagle's May 2020 counterclaim does not "admit" that Eagle knew about *those* issues with the dredge *before* chartering it to Specialty. Rather, per Eagle, *"[a]fter* Specialty took possession.....Eagle, via Specialty, [after November 5, 2019] learned of the *additional* issues.....that lead to Eagle's ....counterclaim against Gulf Sand[]" on May 14, 2020. (Doc. 123 at 3-4, 14 (citing Doc. 114-2 (emphasis added))).  Additionally, as to any misrepresentation about the age of the dredge pump, Eagle also alleged in the state counterclaim that its age had been mispresented to Eagle by Gulf Sand -- again, based on what Specialty told Eagle in early 2021 -- after November 5, 2019 and after Specialty took possession of the dredge.  (Doc. 123 at 4).  In

19

sum, per Eagle, "the First Amended Counterclaim directly alleges that Eagle corrected issues before Specialty took possession of the Vessels and that *the later issues were learned of via Specialty after Specialty took possession of the Vessels*."  (Doc. 123 at 15 (citing 114-2) (emphasis added)). Thus, per Eagle, the state court counterclaim is not an admission of anything regarding the condition of the EDWARD G at the time Specialty took possession in July 2019, other than stating that any problems had already been repaired by Eagle and that the issues/problems known to Eagle has been corrected.

Regardless, Eagle's counterclaim filed in a separate lawsuit is not a binding judicial admission *in this case*, but only a "mere evidentiary admissions that ...[Eagle is]... free to rebut with other evidence and from which the jury could draw its own inferences....[t]hus, the court [will] permit[] the jury to decide for themselves what weight should be given to the statements[]" contained therein.  Tucker v. Housing Auth. of Birmingham Dist., 507 F.Supp.2d 1240, 1275 n.40 (S.D. Ala. 2006).  See also Matter of Raiford, 695 F.2d 521, 523 (11th Cir. 1983) (a statement does not necessarily bind the party as a judicial admission when made in a different case, but rather serves as an evidentiary admission -- "[n]ormally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases. 4 J. Wigmore, *Evidence* § 1066 at 86 (Chadbourn rev. 1972)...."[]); Thyssen Elevator Co. v. Drayton-Bryan Co., 106 F.Supp.2d 1355, 1361 (S.D. Ga. 2000) ("a judicial admission binds only in the litigation in which it is made. In any other suit ... it operates merely as an evidentiary admission; for remember that a judicial admission is in the nature of a waiver. A waiver is a deliberate relinquishment of a known right, and a waiver made for purposes of one lawsuit needn't have been intended to carry

over to another[]"); 2 McCORMICK ON EVIDENCE § 257 (8th ed.) ("A party's pleading in one case may generally be used as an evidentiary admission in other litigation[]").

**B.**     <u>**Charles Simmons' testimony**</u>

Specialty also relies on the testimony of Simmons as supporting its fraudulent inducement claim as follows: "Simmons, one of Eagle's three principals and the signatory of the Charter Party for the EDWARD G, testified as to additional facts which support a finding that the EDWARD G was not in the condition Eagle represented it to be when it was trying to induce the Specialty Entities to enter into a Charter Party."  (Doc. 115 at 2).  According to Specialty, Simmons' testimony shows that Eagle misrepresented material facts concerning the subject matter of the contract (that Eagle's made false representations about the dredge's condition).  Additionally, Specialty argues that Whitmer and Maturin testified about the dredge's condition and that their testimony supports its fraudulent inducement defense.  (Id. at 21 (citing Doc. 114-6 at 9-10 (Dep. Whitmer at 41-42 and Doc. 114-7 at 10-13 (Dep. Maturin at 148-149 and 152-153)).

After conducting a review of the evidence, the Court finds that there are genuine issues of material fact as to whether Eagle fraudulently induced Specialty to enter into the Charter Party by misrepresenting the condition of the EDWARD G.  In sum, the parties' vigorously dispute whether any misrepresentations about the condition of the dredge were made by Eagle to Specialty at the time of the June 2019 contract, and each submit evidence in support of their positions -- including but not limited to arguing the specifics of the representations made, discussions regarding the dredge and any repairs, the timing of any repairs, what knowledge Eagle held regarding the dredge's condition and when, what knowledge Specialty held regarding the dredge's condition and when, whether Specialty accepted the dredge at the time of contract "as is," whether Specialty

agreed to handle the majority of the Schedule A repairs, etc.  On summary judgment, movant Specialty bears the initial burden of showing that _no_ genuine disputes of material fact exist for its fraudulent inducement affirmative defense and that it is entitled to judgment as a matter of law on the defense. This, Specialty has failed to do.  Instead, Specialty's fraudulent inducement defense stems from its version of events regarding the dredge's condition, its assumptions about when Eagle was made aware of any condition issues, its interpretations of the communications between Eagle and Specialty as to its condition, etc.  When taking the facts in the light most favorable to the non-movant Eagle, Specialty's motion for summary judgment on its fraudulent inducement defenses is **DENIED.**  See, e.g., Menke v. Triad of Ala., LLC, 2013 WL 6080038, *8 (M.D. Ala. Nov. 19, 2013) (denying summary judgment on the defense of fraudulent inducement and finding that such should be submitted to the jury given the genuine disputes of material fact which were vehemently disputed).

C.     **Void _Ab Initio_ (Fraud in Factum) Relief**

The Court also highlights an issue that has not been addressed by either party.  If Specialty prevails on its fraudulent inducement defense, Specialty seeks to have the Charter Party declared void _ab initio_.  However, it appears that the caselaw does not support this relief.  As explained in Solymar Invs., Ltd. v. Banco Santander S.A., 672 F.3d 981, 994 (11th Cir. 2012) (citation omitted):

> ... [W]e note the distinction in case law between fraud in the factum and fraud in the inducement....[f]raud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action. On the other hand, [f]raud in the factum occurs when a party procures a[nother] party's signature to an instrument without knowledge of its true nature or contents."

And "[a] successful fraud in the factum claim makes the underlying contract void *ab initio*, *Baumann v. Savers Fed. Sav. & Loan Ass'n.* 934 F.2d 1506, 1516 (11th Cir. 1991) ("Fraud in the factum renders an instrument entirely void...."), whereas a successful claim for fraud in the inducement only makes the underlying contract voidable. *See Fed. Sav & Loan Ins. Corp. v. Gordy*, 928 F.2d 1558, 1565 (11th Cir. 1991) "Fraud in the inducement ... render[s] the instrument merely voidable and thus capable of transfer.") ... <u>Solymar</u> 672 F.3d at 994 at n. 13.

## IV.    <u>Conclusion</u>

Accordingly, it is **ORDERED** that the Specialty Defendants' motion for summary judgment (Docs. 114, 115) is **DENIED.**

**DONE** and **ORDERED** this the **20th** day of **January 2022.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**